### 43468. DeKALB COUNTY et al. v. ALBRITTON PROPERTIES et al.
(344 SE2d 653)

PER CURIAM.

The DeKalb County Board of Commissioners denied the appellees' application to rezone the Lake Hearn neighborhood from single family residential classification to an office and institutional classification. The DeKalb County Superior Court held the single family residential zoning classification unconstitutional. DeKalb County, in its appeal of the Superior Court's ruling, raises seven issues. We affirm.

The Lake Hearn subdivision lies south of Lake Hearn Drive as it runs between Peachtree Dunwoody Road and Ashford Dunwoody Road. I-285 lies to the north of the neighborhood. Two five story office buildings lie to the northeast and northwest. One other office building lies to the northeast, across Ashford Dunwoody Road. Single family residential subdivisons lie to the south and southeast. Peachtree Dunwoody Road and the western end of Lake Hearn Drive in Fulton County have been commercially developed.

All of the present homeowners in the Lake Hearn neighborhood banded together for a neighborhood "sell-out" to appellee Albritton, contingent upon the rezoning of the neighborhood from R-100, a single family residential classification, to O-I, an office and institutional classification. According to Albritton's conceptual site plan, the Lake

Hearn Office Complex would, after ten years, contain two twenty-five story office buildings, two twenty-one story office buildings, two eighteen story office buildings, four fifteen story office buildings, seven twelve story office buildings, four nine story office buildings, two six story office buildings, an eighteen story hotel, and a nine floor museum. The complex would also include a health club, an amphitheater, jogging trails, and a twenty-three acre buffer zone abutting the Byrnwick subdivision to the south.

The DeKalb County Planning Department recommended a denial of the rezoning application. The Planning Commission recommended conditional approval. The Board of Commissioners denied the application by a 6-1 vote.

The neighborhood consists of 144 homes, ninety-seven of which are owner occupied, forty-four of which are renter occupied, and three of which are vacant. The average home in the neighborhood was valued by the appellees at $107,000. Each of the homeowners involved in this case has agreed to sell their homes for at least $225,000 to appellee Albritton.

Thirteen neighborhood homes were sold between 1979 and 1984. Ten of the homes, now renter occupied, sold for 18% to 63% over the previous sale price. The three other homes, now owner occupied, sold for 3.24%, 3.77%, and .25% over their previous sale prices. These sales occurred in 1980, 1981, and 1982. No decrease in the value of any home in the neighborhood was shown through appraisal or resale. The rate of appreciation of value for similar homes in DeKalb County averaged ten to twelve percent.

A number of Lake Hearn homeowners testified that the quality of life in the neighborhood had declined as commercial development crept closer to the neighborhood. They stated that traffic had become a problem, that noise from I-285 was intolerable, and that many of the homes in the neighborhood had fallen into disrepair since occupied by renters. They felt that they had lost the battle to preserve the residential character of the neighborhood, and that they should now be allowed to surrender.

The appellees' experts painted a picture of inexorable commercial growth in the Perimeter Center area. James Wilson, President of appellee Albritton, testified that the residents of Lake Hearn were being used as human buffers against commercial development. He claimed that his development would not impinge upon adjacent neighborhoods. He described the agreement that he reached with a number of residents in the neighboring Byrnwick subdivision to preserve a very large buffer zone between the new development and the abutting neighborhood.

The appellees' traffic expert testified as to foreseeably necessary roadway improvements in the Perimeter Center area. He stated that

such improvements would be necessary, notwithstanding any change in the zoning of the Lake Hearn neighborhood. He noted that the majority of his recommended improvements have been included in the Atlanta Regional Commission's long-range plan, but that the ultimate authority to approve a number of the recommended improvements rested with the State Department of Transportation (DOT). He also testified that traffic volume on Lake Hearn Drive was 1,200 vehicles per hour, and that Lake Hearn Drive could acceptably handle up to 1,400 vehicles per hour.

A land use expert testified for the appellees that noise created by traffic on I-285 rendered the Lake Hearn neighborhood unsuitable for residential use. Noise in part of the neighborhood exceeded the maximum limits for V.A. or F.H.A. mortgage approval. He stated that noise levels on the Lake Hearn tract would be acceptable for commercial or industrial development, and that the proper commercial development on the tract could actually improve noise levels in the adjacent Byrnwick neighborhood. He testified that the neighborhood should not remain residential.

The appellees' real estate appraisal expert testified that the highest and best use for the Lake Hearn tract would be a mixed-use development consisting of office and retail space, with an adjacent hotel. He found that the property would be worth $43,000,000 zoned for its highest and best use. He found that the property would be worth $15,307,000 if maintained as a neighborhood. He believed that the value of the land would depreciate if not rezoned. He finally concluded that a twenty-three acre buffer zone between any development and the Byrnwick subdivision would preserve the value of that subdivision.

Another land use planning expert testified for the appellees that R-100 zoning was inappropriate for the Lake Hearn subdivision. He asserted that maintenance of that zoning classification would lead to deterioration of the neighborhood and would thus result in a detriment to the public interest. He stated that the best zoning for the land in question was an office and institutional classification, and that the land could be developed pursuant to that zoning in a manner in which it would not harm neighboring residential developments. He finally testified that the three office developments adjacent to the Lake Hearn neighborhood are zoned an office and institutional classification in violation of the county comprehensive development plan.

A final land use planning expert also testified for the appellees that he would consider the maintenance of a single-family residential zoning classification for the Lake Hearn neighborhood to be equivalent to spot zoning. He testified that an office and institutional zoning classification would be appropriate for that piece of property. He stated that he believed that the property's value would decrease

under any residential classification.

An urban planning expert testified for the appellees that the land in question is in the final stages of a "land use succession" from rural to residential to commercial use. He testified that the Perimeter Center is "the most active nodal development in the United States . . ." He asserted that in ten years, Perimeter Center area will have more office and retail space than downtown Atlanta. He stated that the public interest, would be harmed by a refusal on the part of the county to allow the land to be used for its natural use. He stated that the increase in land value attributable to rezoning would expand the county tax base, facilitating improvements in the infrastructure.

An expert appraiser testified for the appellants that in a neighborhood near Lake Hearn and similar in character to Lake Hearn, the proximity of homes to I-285 did not affect the value of the homes. He testified that the mean and median prices for homes sold in Lake Hearn increased consistently from 1979 to 1984, except for a slight lull in late 1982 and early 1983. The increases were similar to those found in sales of homes within a three mile radius of Lake Hearn. He asserted that the lull was related to changes in mortgage rates in Atlanta, not to the construction of the office buildings adjacent to the neighborhood. He testified that he considered the neighborhood to be a viable single-family neighborhood that would continue to increase in value as such.

A traffic planning expert testified for the appellants that during the peak period, Lake Hearn Drive operated at 63% capacity. He stated that an increase in traffic from the Lake Hearn area would increase congestion at the intersection of Ashford Dunwoody Road and I-285. He stated that traffic volume at that intersection already exceeded its capacity.

The Director of Public Works for DeKalb County named the eighteen road improvements that the county had committed itself to undertake. None of the improvements under construction at that time were in the Perimeter Center area. Funds had not been committed to any listed improvement in the Perimeter Center area. Ashford Dunwoody Road was the fifth road in need of widening according to the county plans which were based upon an analysis of traffic generated by land as zoned according to the DeKalb County comprehensive development plan. The Director stated that there were 280 streets in DeKalb County which had traffic counts higher than Lake Hearn Drive that were developed with single-family residential homes. He finally testified that although the sewer lines in the area could handle the increase in sewage that would be caused by a development such as the one proposed by the appellees, the county already exceeded the volume allowed in its contract with the City of Atlanta for use of the city's treatment plant.

An engineer for the DOT testified that the DOT sometimes seeks to control traffic on interstate highways by limiting access to highways from existing ramps. He explained that one way of doing this is to maintain a ramp with low capacity, even where traffic volume on the ramp exceeds its capacity. He asserted that the DOT planned to use this type of access control at the intersection of Ashford Dunwoody Road and I-285 by refusing to widen or improve any of the ramps at the intersection, even if the appellees offered to pay for the improvements. This, he said, would prevent traffic on I-285 from deteriorating even further than it had deteriorated.

Two tenants of rental homes in the Lake Hearn neighborhood testified that the neighborhood was a pleasant place to live. They testified that yards were generally well-kept and that the ambience was peaceful. Each one testified that she would like to purchase a home in the neighborhood.

An assistant planning director for DeKalb County testified that there were 1,375 subdivision lots as close to I-285 as the Lake Hearn neighborhood between the Fulton County line and Doraville. He described a number of subdivisions situated somewhat similarly to Lake Hearn.

A planning expert described for the appellants the relationship between land use planning and zoning. He then described the process by which DeKalb County formulated its comprehensive development plan. He testified that he would recommend to DeKalb County that the Lake Hearn neighborhood remain in a low density residential zoning classification. He felt that intensification of land use in the Lake Hearn neighborhood would impact negatively upon the area south of Lake Hearn along Ashford Dunwoody Road.

Finally, the Planning Director for DeKalb County asserted that rezoning of the Lake Hearn subdivision to a denser classification would exert pressure to intensify development upon property south of Lake Hearn. He stated that such a rezoning of Lake Hearn would be inconsistent with the county framework plan for land use and the comprehensive development plan. Such a rezoning would contravene the county policy seeking to preserve the neighborhoods south of I-285 in the Perimeter Center area. He considered the Lake Hearn subdivision suitable for residential development.

1. The appellants differ with the trial court's determination that the county's application of the R-100 zoning classification to the Lake Hearn subdivision deprives the property owners of their constitutional rights.

As the law of zoning has developed in Georgia, the plaintiff, bearing the burden of proof, must first overcome the presumptive validity of the zoning ordinance that he attacks by establishing, by clear and convincing evidence, that the zoning ordinance "is significantly detri-

mental to him, and is insubstantially related to the public health, safety, morality, and welfare." *Flournoy v. City of Brunswick*, 248 Ga. 573 (285 SE2d 16) (1981). If the plaintiff carries his burden, the defendant must, of course, present evidence overcoming the plaintiff's proof. Id.

(a) First, we address the plaintiffs' assertion that R-100 zoning imposes a significant detriment upon the enjoyment of their property rights.[1]

Residents of Lake Hearn testified that the only access to and from their property led through commercial developments, and that they now "live[d] in an office park." Taking speculation, acknowledged by the defendants' expert, into account, the appreciation of the value of homes in Lake Hearn lagged seven to nine percent behind the appreciation in value of similar nearby homes. The value of the entire tract as zoned R-100 amounted to roughly one third, or thirty million dollars, less than the potential value of the tract as zoned O-I.

While evidence conflicted as to the present suitability of the neighborhood for residential use, the appellees' experts established a downturn in viability of the neighborhood as a residential area, and they foresaw a sharper downturn of land value if the land remained under a residential classification. One expert termed the property an inverse spot zone, hemmed in by an interstate highway, some commercial development in DeKalb County, and massive commercial development in Fulton County.

Though the land in question certainly retains some value as zoned, we find that overall, the evidence established the "significant detriment" required to be established under *Flournoy*, supra.[2]

(b) Next, we consider the relationship of that detriment and the present zoning to the public health, safety, morality, and welfare. This involves the third and fourth lines of inquiry found in *Guhl v. Holcomb Bridge Rd.*, supra.

A change in the zoning of Lake Hearn from R-100 to O-I would violate the county's comprehensive development plan.[3] Experts for both sides attested to the value of a comprehensive development plan as a land use planning tool. The appellees' experts showed that in allowing commercial development adjacent to Lake Hearn, the county had already violated its plan, and that blind adherence to the plan in

---

[1] Our consideration will involve, among other things, the first, second, fifth, and sixth lines of inquiry listed in *Guhl v. Holcomb Bridge Rd. Corp.*, 238 Ga. 322, 323 (232 SE2d 830) (1977).

[2] Evidence as to the effect of noise on Lake Hearn, the effect of traffic on Lake Hearn Drive, and the effect of the proximity of I-285 on the neighborhood was evenly matched.

[3] Though this may void a rezoning where the jurisdiction has put "teeth" into its zoning ordinance by requiring compatibility between the plan and actual zoning, see *Moore v. Maloney*, 253 Ga. 504 (321 SE2d 335) (1984), this issue was not raised.

this case would only harm the county's citizens by leading to the creation of a blighted neighborhood in Lake Hearn. The appellants' experts testified that the plan was generally designed to preserve the valuable residential character of the Perimeter Center area south of I-285, and that the rezoning of Lake Hearn would frustrate the plan's intent.

As established in the testimony of the many experts, a comprehensive development plan may play an important role in enhancing the public health, safety, morality, and welfare. Two factors in this case, however, combined to render DeKalb County's plan a less effective planning tool.

First, the county sanctioned the violation of its own plan by allowing the construction of three office buildings in the immediate vicinity of Lake Hearn in an area designated for residential development. This alone, however, might not sever the connection between the plan and the public good in this specific case. Another factor bears upon our determination.

An aerial photograph of the Perimeter Center area reveals that the Fulton-DeKalb County line, which bisects Lake Hearn Drive, may be clearly delineated by the contrast between commercial development in Fulton County and residential development in DeKalb County. The DeKalb County plan of preserving residential development south of I-285 had been outflanked by Fulton County's allowance of commercial development, creating a situation in which land use outside of DeKalb County's control impacts directly upon the property of DeKalb County property owners such as the appellees. This photograph and other evidence produced at trial show that one price of a failure in cooperation between neighboring jurisdictions may be the unraveling of a comprehensive development plan at its edges.

The intrusion from within DeKalb County upon the development plan and the existence of a radically different land use approach immediately adjacent to Lake Hearn in Fulton County defeat the purpose of the comprehensive development plan for this particular area. This renders the necessity of zoning in compliance with the plan insubstantially related to the public health, safety, morality or welfare.

The appellants contend that the zoning of Lake Hearn to O-I would impact negatively upon neighborhoods to the south along Ashford Dunwoody Road. They point out the alleged effect of the three developments near Lake Hearn upon the neighborhood and assert that a larger development at Lake Hearn would have a larger effect upon adjacent neighborhoods.

The appellees contend that the enormous size and the topography of the Lake Hearn tract would allow a very large buffer to protect the adjacent neighborhoods, particularly in light of the ravine be-

tween Lake Hearn and its southern neighbors. Their experts testified to that effect. One expert testified the appellees' project itself would provide a buffer between I-285 and residential neighborhoods south of the interstate. The neighbors in the Byrnwick subdivision owning homes immediately adjacent to the Lake Hearn tract testified in favor of the rezoning after signing a covenant with the appellees by which the appellees agreed to leave a twenty-three-acre buffer of natural growth between the development and the Byrnwick subdivision.

While commercial development itself is not harmful by nature to the public, see *Sellars v. Cherokee County*, 254 Ga. 496, 497 (330 SE2d 882) (1985), the appellees have relied heavily upon the harm caused to their residences by commercial development north of their property along I-285. The appellees have established, however, that a very large buffer, encompassing the ravine on the southern portion of the property, could protect the neighboring subdivisions from development such as the development the appellees wish to escape from themselves. They have shown that continued application of R-100 zoning to Lake Hearn is not necessary as a buffer for adjacent neighborhoods, and thus that continued application of that zoning to Lake Hearn would not enhance the public health, safety, morality, or welfare.

Lake Hearn Drive intersects Peachtree Dunwoody Road on the west, in Fulton County. This affords another outlet onto a major artery in addition to the outlet onto Ashford Dunwoody Road on the east. Even though it was shown that traffic generated by O-I zoning would, in ten years, climb to 38,000 trips per day, and that congestion was present at I-285 and Perimeter Center on Ashford Dunwoody Road, there was no evidence as to the amount of traffic flowing south on Ashford Dunwoody Road or as to how much of this traffic would flow westward onto Peachtree Dunwoody Road. Obviously these two outlets will absorb a large portion of this traffic. Certainly all of the increased traffic flow will not go onto I-285.

The appellees showed that they would be willing and able to pay for many improvements necessary to prevent stagnation in traffic patterns. They also showed that the increase in the tax base to the county would be so enormous that improvements in the county infrastructure, including road improvements, would be possible where they were not before. The county showed that the DOT did not plan to allow one of the improvements planned by the appellees, and that, based upon current land use plans, only one improvement in the Lake Hearn area was imminent. Although renewed planning could be mandated by rezoning of Lake Hearn, we find the evidence of the effect of R-100 zoning of Lake Hearn upon traffic in DeKalb County, from physical and financial standpoints, to be equally divided between positive and negative.

The size, topography, and location of the Lake Hearn neighborhood, as well as the nature of surrounding areas and the lack of objection to rezoning by the southern neighbors, lead us to the conclusion that the benefit to the public in applying the R-100 zoning classification to Lake Hearn does not justify the maintenance of that zoning in light of the detriment caused to the property by that zoning.

2. We, and the trial court, have relied upon our interpretations of our state constitution in determining the outcome of this case. We do not read the trial court's order as a ruling that a violation of the federal constitution has occurred, and we need not consider whether or not such a violation may have occurred. See *State v. Luck*, 252 Ga. 347, 350 (312 SE2d 791) (1984) (Smith, J., dissenting).

3. The appellants contend that the trial court should not have ruled that "any residential classification as applied to Lake Hearn would be unconstitutional, null and void."

We read the trial court's order in light of *City of Atlanta v. Mc-Lennan*, 237 Ga. 25 (226 SE2d 732) (1976), as simply enjoining the application of the R-100 zoning classification to the Lake Hearn subdivision as a whole. An injunction against the application of the R-100 classification to *any* individual portion of the subdivision would not be responsive to the county's action, and would clash with the directives of *City of Atlanta v. McLennan*, supra. So read, the court's directive is appropriate.

4. While the trial court's order certainly provides an excellent point of departure for our inquiry, we reiterate that, "our focus is not whether there was evidence to support the trial court's decision, but whether there was evidence to support the county's decision. [Cit.]" *DeKalb County v. Chamblee Dunwoody Hotel Partnership*, 248 Ga. 186 (281 SE2d 525) (1981). Thus, while well-taken, we need not further address the complaints contained in the appellants' remaining enumerations of error.

*Judgment affirmed. All the Justices concur except Hunt, J., who concurs specially, and Bell, J., who dissents.*

HUNT, Justice, concurring specially.

While I concur in the result reached by the majority, I write separately to make two points.

First, the statement in Division 1 (a) that the plaintiffs had the burden of showing by clear and convincing evidence that the zoning constituted a "significant detriment" to the enjoyment of their property rights is an incomplete statement of the required standard and is therefore potentially misleading. It is clear beyond peradventure that the "significant detriment" must rise to the level of an unconstitutional taking of the property. *Flournoy v. City of Brunswick*, 248 Ga. 573 (285 SE2d 16) (1981). It must, in short, be confiscatory. *Barrett v.*

*Hamby*, 235 Ga. 262 (219 SE2d 399) (1975). I deem it important to reiterate this standard in order to keep the nature of the issue in the forefront of our law of zoning. We deal, in cases like this, with the right of the local governing authority to govern; that is, DeKalb County has the power, committed to it by law, to control land use within its borders by enacting zoning ordinances. That power may be abrogated by the judicial branch only on a clear showing that it has been unconstitutionally exercised, that is, a showing that the ordinance, as applied to the property at issue, is arbitrary and capricious so as to result in an unconstitutional taking without compensation. *Guhl v. Pinkard*, 243 Ga. 129 (252 SE2d 612) (1979); *Guhl v. M. E. M. Corp.*, 242 Ga. 354 (249 SE2d 42) (1978).[1] This standard must be scrupulously honored by this court in order that the integrity of local zoning ordinances be maintained.

This leads to my second concern with the majority opinion, which is that Division 4 is likewise incomplete and may, by its brevity, be misleading. In Division 4 the court states: "While the trial court's order certainly provides an excellent point of departure for our inquiry, we reiterate that, 'Our focus is not whether there was evidence to support the trial court's decision, but whether there was evidence to support the county's decision,'" citing *DeKalb County v. Chamblee Dunwoody Hotel Partnership*, 248 Ga. 186 (281 SE2d 525) (1981). The opinion in that case, I would note, goes on to say, "If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." That is simply tantamount to saying, as was held in the seminal case of *Barrett v. Hamby*, supra, 235 Ga. at 265, that the ordinance bears a presumption of constitutionality. It did not change the rule that the trial court's findings of fact will not be set aside unless they are clearly erroneous. OCGA § 9-11-52 (a); *City of Atlanta v. McLennan*, 240 Ga. 407 (2) (240 SE2d 881) (1977); *Bd. of Commrs. v. Skelton*, 248 Ga. 855, 857 (286 SE2d 729) (1982). Nor did it affect the decision in *Guhl v. Pinkard*, 243 Ga. 129, 130, n. 1 (252 SE2d 612) (1979), where this court recognized that a zoning appeal presents a constitutional issue which is a question of law for resolution by this court.

After hearing the evidence, the trial court in this case set out some six pages of findings of fact. Having reviewed his findings and determined that they are supported by the record, I conclude that there is clear and convincing evidence that the R-100 zoning classifi-

---

[1] I note here my agreement with the trial court's statement that: "When the case law describes a zoning ordinance as being "arbitrary," "capricious," or "confiscatory," it does not use these terms in their common, vernacular meanings. These too are legal words of art, and do not connote, imply, or [impute] whimsicalness or malice on the part of the zoning authorities."

cation is unconstitutional as applied to this property.

BELL, Justice, dissenting.

The decision of the majority of this court flies in the face of the substantial evidence which supports the county's decision. In sustaining the judgment of the superior court, this court has usurped the function of the county commission.

DECIDED JUNE 25, 1986.

*Jenkins, Bergman & Darroch, Frank E. Jenkins III, Robert M. Darroch, Ruth A Zaleon,* for appellants.

*Dillard, Greer, Westmoreland & Wilson, G. Douglas Dillard, Carl E. Westmoreland, Jr., Dick Wilson, Jr., Sutherland, Asbill & Brennan, James H. Wilson, Jr., Alston & Bird, G. Conley Ingram, A. James Elliott, Kilpatrick & Cody, Wilbur B. King,* for appellees.

*James F. Grubiak, Walter E. Sumner, Robert D. Clark, Timothy J. Sweeney,* amici curiae.