1. Under the zoning ordinance of the City of Atlanta, undertaking establishments, together with other business and uses enumerated as Class U-7, may, under § 93-210 of the Code of the City of Atlanta, be located in any use district; provided such use in such location will in the judgment of the Board of Zoning Appeals substantially serve the public convenience and welfare, and will not substantially and permanently injure the appropriate use of the neighboring property. McCord v. Ed Bond Condon Co., 175 Ga. 667 (165 S.E. 590, 86 A.L.R. 703). *Page 297 
2. Where, under the terms of a city code, a particular business can not be located in any use district except by a permit from the Board of Zoning Appeals, and when to procure said permit it is necessary to establish that the use intended would substantially serve the public welfare and not substantially and permanently injure the appropriate use of the neighboring property, the burden of proof is on the applicant. Hyer v. Holmes Co., 12 Ga. App. 837 (3) (79 S.E. 58); 42 Am.Jur. 466, § 131; 31 C. J. S. 718, § 108.
3. Whether to issue a permit allowing the undertaking establishment to locate in this particular use district was a question in the discretion and judgment of the Board of Zoning Appeals under the terms of the Code, City of Atlanta, § 93-210, and the courts will not control this discretion unless manifestly abused. Chipstead v. Oliver, 137 Ga. 483 (2) (73 S.E. 576).
4. If the evidence had shown only a fanciful or aesthetic reason why the permit was not granted, the board would have abused its discretion; but there being some evidence, though in conflict with other evidence, that the funeral home would substantially and permanently injure the appropriate use of the neighboring property, this court can not say the board's action was unreasonable, arbitrary, and discriminatory.
Accordingly the judgment of the Court of Appeals is
Reversed. All the justices concur.
 No. 16559. APRIL 12, 1949. REHEARING DENIED MAY 12, 1949.
Awtry and Lowndes Company sought the permission of the Board of Zoning Appeals to relocate its undertaking establishment from 21 Cain Street to 396 Ponce de Leon Avenue, a building which at that time was being used by the Standard Club, a private social organization. The Yaarab Temple of the Shriners, a fraternal organization, owning the lot adjoining the Standard Club property on the west, interposed an objection, asserting that they had acquired the property for the purpose of erecting a mosque. From the evidence it is apparent that the term "mosque" as here used denotes a club, home lodge, or headquarters.
The north side of Ponce de Leon Avenue, where both pieces of property are situated, had been zoned for business property. Under the zoning ordinance of the City of Atlanta, designated as U-7, are: crematory, cemetery, sewage disposal plant, refuse dump, undertaking establishment, and certain described markets or vacant lots, and church. Under the Code of the City of Atlanta, § 93-210, it is provided: "Use district exceptions. (a) The Board of Zoning Appeals may in a specific case, after public notice and hearing and subject to appropriate conditions *Page 298 
and safeguards, determine and vary the application of the use district regulations herein established in harmony with their general purposes and intent as follows: . . (5) Permit the location of a Class U-7 use in any use district provided such use in such location will in the judgment of the Board of Zoning Appeals substantially serve the public convenience and welfare and will not substantially and permanently injure the appropriate use of the neighboring property."
Pursuant to the foregoing provisions of the City Code, the Board of Zoning Appeals had a hearing at which both the applicant and the objectors were heard. Awtry and Lowndes Company, the applicant, produced evidence substantially as follows:
C. C. Styron, Chief of the Fire Department, testified: that, under the present location of the applicant — by reason of its close proximity to Number 8 Fire Station, the parking and processions incident to a funeral, the frequency of funeral processions being required to proceed from the present funeral home and pass the fire station in order to reach cemeteries in certain sections of the city — such conditions directly affect the safety of the city, if a fire should occur, as there would necessarily be a delay of the fire trucks, and it would be for the best interest of the city from a fire hazard and a safety standard, if they were permitted to move to some other place.
Herbert T. Jerkins, Chief of Police, testified: That there is traffic congestion on Cain Street between Peachtree and Spring, by reason of its use for a funeral. It is one of the most congested areas, and if the funeral home was elsewhere, it would improve traffic conditions.
Marvin Thomas, Captain of Traffic of the Police Department, testified: That traffic on Cain Street between Peachtree and Spring Streets is acute, and that something must be done to relieve the situation. Heavy loading and unloading of trucks on the south side and several funerals a week on the north side, where the funeral home is located, necessitate parking at an angle or double parking; and it is sometimes necessary to completely block out the traffic. If the funeral home was moved from this location, it would help greatly to clear the volume of traffic on Cain Street.
W. C. Wallace testified: That he owned the adjoining property on the east side of the Standard Club and on the west side *Page 299 
of the property of the Shrine. For the past fifteen years he has operated a hotel and tourist home next to the Standard Club, and both he and his guests are constantly annoyed late at night and in the small hours of the morning by the noise, horn blowing, hollering, and screeching at the Standard Club, and that it does not cease when their attention is called to it and a request is made. His driveway is often blocked by the cars of people attending the club. Conditions at this club have made his rooms upon that side of his building undesirable by some of his patrons and their rental value his diminished. He further testified that he was in favor of the application being granted; and that it would be an improvement over present conditions, as he felt that he could sleep better next to the dead.
Mrs. W. C. Wallace also advocated granting the application.
Dr. Paul James, Pastor of the Baptist Tabernacle on Luckie Street, and Chairman of the Baptist Student Committee who were erecting a students' center almost directly across the street from the proposed location of the funeral home, testified that both he and the student committee could see nothing against having the funeral home there and rather favored that location for it.
J. W. Awtry testified: That he is President of Awtry and Lowndes Company; that they had been located on Cain Street since 1922; that there is not any noise or disturbance about the funeral mortuary either in the daytime or at night. The funerals are conducted in the daytime, except that once or twice a year there would be one in the evening. That he was a member of the Shrine and practically all of their activities are carried on at night. All the bands practice and all the different organizations meet at night. The Shrine functions at night mostly and the mortuary in the day time. His company by conducting a mortuary business at that place would not interfere with the activities of the Shrine in any way.
Frank Lowndes, also identified with Awtry and Lowndes Company, testified the same as J. W. Awtry.
J. D. Erwin, who resided at 419 Ponce de Leon Avenue and owned 414 Ponce de Leon Avenue, and also Mrs. E. W. Adams, who owned 425 Ponce de Leon Avenue, testified that they were in favor of granting the permit for the mortuary to be located *Page 300 
there. Also there was a petition by Mrs. Cunningham, owner of 420, Mrs. E. W. Adams and Mrs. Block at 385, and Mrs. Gullatt at 401, all on Ponce de Leon Avenue.
The objectors introduced seven witnesses, who included the potentate, the second in command, and four past potentates. A summary of their composite testimony was as follows: The Shrine has been in Atlanta since Atlanta has grown from its infancy. The Shrine had occupied other sites for its headquarters. At one time it had occupied a building near or adjacent to the present location of Awtry and Lowndes Company's funeral home, and apparently neither had interfered with the other. It was composed of more than five thousand members. They had purchased the lot in question, made plans, employed architects, and were getting ready to build a mosque thereon. They maintained certain charities, but also indulged in frivolity and fun. They recognized that funerals are held in the daytime almost exclusively, though occasionally there may be one held at night. Their activities are largely held at night, though on occasions they have ceremonies in the daytime. Their building will be used for various meetings, activities, and ceremonies. They have two brass bands for musical purposes that will use the building for band practice. At times during each year they have parades in the daytime accompanied by the bands, which begin and sometimes times end at the mosque. On these occasions the members and the bands will assemble upon the street in front of the mosque, and while so assembling the band may be practicing and warming up their instruments and members laughing and talking in a jolly mood as they go in and out of the mosque. At times when they have a ceremonial, one section which takes an hour and a half will be held in the afternoon, at which time there will be 456 congregating in uniform together with the bands. To hold these ceremonials, it takes over 500 people in committee work planning therefor in advance to produce it, and its plans could not be changed, except to call the whole thing off.
In view of the foregoing purposes and activities of the Shrine, the witnesses predicate their objections to granting the permit, not so much on any particular conduct at the funeral home which would be an annoyance to them, but based on the fact that the funeral home, with the presence of the dead and the constant *Page 301 
visitations of the bereaved members of the families and friends of the dead, creates such a depressing atmosphere and is so surrounded by a pall of gloom that their gentlemanly instincts and finer sensibilities would preclude them from carrying on their normal activities and thus prevent them from using the property for the purpose for which it was acquired. It was also insisted that, should they disregard the presence of the funeral home and pursue their normal activities, such conduct on their part would rightly subject them to the condemnation of the public. Furthermore it was related that this was also the opinion of five or six hundred members whose attention had been called to the situation, and it was doubtful if the five thousand members would agree to the financing of a building on their lot under the circumstances.
Under the foregoing evidence the Board of Zoning Appeals denied the permit sought by Awtry and Lowndes Company. On a petition and writ of certiorari to Fulton Superior Court, the finding of the board was affirmed. On exceptions to this judgment the Court of Appeals reversed the judgment of the lower court. The case comes to this court by writ of certiorari.