## 33784. POPE v. CITY OF ATLANTA et al.

HALL, Justice.

This appeal presents a constitutional challenge to the Metropolitan River Protection Act (Ga. L. 1973, p. 128 et seq., as amended by Ga. L. 1975, p. 837), and the Chattahoochee Corridor Study, authorized by the River Act and adopted by the City of Atlanta. Atlanta Regional Commission, Chattahoochee Corridor Study (1972).

The Metropolitan River Protection Act ("River Act") permits a planning commission for a metropolitan area with a population of one million or more persons to develop a comprehensive plan for land and water use along stream corridors when a stream supplies forty percent or more of the water for the metropolitan area. River Act, § 4. A "stream corridor" is all land within 2,000 feet of the water course. Sec. 2 (e). The planning commission is also authorized to develop plans for the fifty-year flood plain of the stream, land which probably will be flooded once every fifty years. Sec. 2 (f).

The Chattahoochee River provides most of the water for the City of Atlanta, and the Atlanta Regional Commission (ARC) developed a comprehensive plan for the 48 mile long stream corridor from Buford Dam to Peachtree Creek. The Commission divided the stream corridor into 23 sections, each of which was analyzed and mapped according to six factors to determine which land was vulnerable to damage by development and which land was suitable for development. Those factors were geology, hydrology, soils, vegetation, slope and aspect. ARC also ranked proposed land uses from recreational use through thirteen housing types to commercial and industrial developments according to the effect of the land

use on the land. When the land vulnerability study and the study on effects of development were combined, the result was a development plan which allocated land uses by matching types of development with land best suited for the development.

Even though ARC developed the Corridor Study, the Commission has no enforcement powers. After a political subdivision adopts the Corridor Study, land or water use inconsistent with the Study is forbidden. A use is deemed inconsistent until the political subdivision issues a certificate of compliance for any clearing, construction, excavation or filling in the stream corridor. After issuance of the certificate, ARC reviews the certificate and may recommend modification if it finds that the proposed use is inconsistent with the Corridor Study. The political subdivision may accept the Commission's recommendation, override it or request reconsideration of the proposed use. River Act, §§ 5, 6.

Minimum standards for the certificate with respect to the subject river's fifty-year flood plain and the area within 150 feet of the watercourse are specified in the Act. Uses within these overlapping areas are restricted to those uses "not harmful to the water and land resources of the stream corridor . . . [which do not] significantly impede the natural flow of flood waters, and [which] will not result in significant land erosion, stream bank erosion, siltation or water pollution."[1]River Act, § 8. Agricultural and animal husbandry uses as well as ordinary maintenance and landscaping are exempt from the Act's restrictions. River Act, § 12.

ARC has developed further standards for the flood plain and the area within 150 feet of the watercourse. Grading and vegetation clearance permits are required; cut and fill operations which would alter the natural flow

---

[1]We read the River Act to apply identical provisions to the flood plain and to the area within 150 feet of the watercourse since these areas overlap. This is ARC's interpretation of its enabling Act, and this interpretation is given great weight. *Undercofler v. Eastern Air Lines,* 221 Ga. 824 (147 SE2d 436) (1966).

of flood waters are not permitted. Only twenty percent of the flood plain may be covered by an impervious structure. Corridor Study, pp. 54-55.

Appellant Pope owns a 3.7 acre tract of land bordering on the Chattahoochee River, which contains a house, driveway, man-made lake and swimming pool. Pope began construction of a tennis court within the stream corridor without a certificate of compliance from the City of Atlanta. The city issued a stop-work order because the tennis court was an impervious structure partially within the flood plain and within 150 feet of the river. The tennis court also required filling and the construction of a retaining wall.

After issuance of the stop-work order, appellant sought a declaratory judgment from federal district court that the River Act was unconstitutional, but the federal court upheld the statute. Pope v. City of Atlanta, 418 FSupp. 665 (N.D. Ga. 1976), affd. mem., 575 F2d 298 (5th Cir. 1978). Appellant then pressed her claim in the Superior Court of Fulton County. On cross appeals from the first decision of the superior court, this court held that Pope's state constitutional claims were not barred by the res judicata effect of the federal suit and that the River Act was not an unconstitutional attempt by the Georgia legislature to exercise local zoning power. Pope v. City of Atlanta, 240 Ga. 177 (240 SE2d 241) (1977). On remand, Pope asserted that because the River Act and Corridor Study prevented the construction on her property of a tennis court, the River Act and Corridor Study unconstitutionally appropriated private property for public use without compensation. The trial court upheld the constitutionality of the statute and the Corridor Study. We affirm.

The inherent police power of the state extends to the protection of the lives, health and property of the citizen, and to the preservation of good order and public morals and is not subject to any definite limitations, but is coextensive with the necessities of the case and the safeguard of public interest. McCoy v. Sanders, 113 Ga. App. 565 (148 SE2d 902) (1966). Further, in the area of environmental legislation, the state Constitution specifically authorizes the General Assembly "to provide

restrictions upon land use in order to protect and preserve the natural resources, environment and vital areas of this State." Code Ann. § 2-1404. Appellant contends that the city's failure to permit her to construct a tennis court is, per se, a taking of property like eminent domain. This position misconceives the law.

The distinction between use of eminent domain and use of the police power is that the former involves the taking of property because it is needed for public use while the latter involves the regulation of the property to prevent its use in a manner detrimental to the public interest. 1 Nichols, The Law of Eminent Domain § 1.42 (3d Ed. 1976). Many regulations restrict the use of property, diminish its value or cut off certain property rights, but no compensation for the property owner is required. Among the valid regulations of property are abatement of nuisances, *Davis v. Stark,* 198 Ga. 223 (31 SE2d 592) (1944); *Mack v. Westbrook,* 148 Ga. 690 (98 SE 339) (1919); zoning, *Barrett v. Hamby,* 235 Ga. 262 (219 SE2d 399) (1975); health regulations, *Vinson v. Home Builders Assn.,* 233 Ga. 948 (213 SE2d 890) (1975) and building standards, *Reed v. White,* 207 Ga. 623 (63 SE2d 597) (1951). This court tests regulation of property to determine that the government has not exceeded its police power, for excessive regulation of property violates the due process clause, Code Ann. § 2-101, and the prohibition against taking property for public use without compensation. Code Ann. § 2-301. In *Vinson v. Home Builders Assn.,* supra, this court stated that exercise of the police power was subject to the limitation that the ordinance bear some "reasonable relation" to the public health. In *Barrett v. Hamby,* supra, this reasonableness standard was further articulated as the requirement that a zoning classification "may only be justified if it bears a substantial relation to the public health, safety, morality or general welfare." 235 Ga. at 265. This approach essentially balances the state's interest in regulation against the landowner's interest in the unfettered use of his property. We adopt a balancing test for the type of police power restriction on property involved in this case.[2]

_____

[2]The type of land use restriction involved in this case

Several other states also measure land use restrictions with a balancing test. E.g., Maple Leaf Investors, Inc. v. State Dept. of Ecology, 88 Wash. 2d 726 (565 P2d 1162) (1977); Turnpike Realty Co. v. Town of Dedham, 362 Mass. 221 (284 NE2d 891) (1972), cert. den., 409 U. S. 1108 (93 SC 908, 34 LE2d 689) (1973).

The interests advanced by the City of Atlanta for these restrictions on appellant's property relate to the public health and safety. Sediment is a major pollutant in the Chattahoochee River. Soil erosion not only damages the land, but the soil carried into the river increases the cost of water treatment and reduces channel capacity, resulting in an increased risk of flooding. Corridor Study, p. 54. Clearing vegetation, grading or cut and fill operations which alter the natural elevation or slope of the land may increase surface water run-off and soil erosion. Further, the construction of impervious structures in the flood plain or within 150 feet of the watercourse means that rain water can not be absorbed by the earth. Surface water run-off, soil erosion and the risk of flooding are thus increased. Corridor Study, p. 55. Requiring permits for grading and vegetation clearance, prohibiting cut and fill operations which alter the natural elevation and limiting the construction of impervious structures are reasonable means of guarding against the dangers of soil erosion, sedimentation and increased flooding. River Act, § 4.

When the state's interests in preventing flooding, halting land erosion and protecting the water supply are weighed against appellant's interest in constructing her tennis court within 150 feet of the river, the state's interests weigh heavier in the balance. The dangers which flow from overintensive stream corridor development may render some property unsuitable for development, and the state is entitled to recognize this

---

is unlike zoning; therefore, the factors suggested in *Guhl v. Holcomb Bridge Rd. Corp.*, 238 Ga. 322 (232 SE2d 830) (1977), for testing the reasonableness of zoning ordinances are inapplicable here.

fact. Although one tennis court might affect the river only slightly, the state is justified in considering the cumulative effect of development when it makes land use plans. Thus, the City of Atlanta and the state have engaged in valid land use regulation and have not appropriated appellant's land for public use without compensation.

The experience of other state courts in reviewing land use development plans buttresses our conclusion in this case. In a case quite similar to our own the Supreme Court of Washington upheld the refusal to grant building permits for single family homes in the Cedar River flood plain, even though seventy percent of the appellant's land was in the flood plain. Maple Leaf Investors v. State Dept. of Ecology, 88 Wash. 2d 726, supra. The Massachusetts Supreme Court upheld flood plain restrictions in Turnpike Realty Co. v. Town of Dedham, 362 Mass. 221, supra. In that case, the court held that land had not been unconstitutionally taken even though its uses were restricted to woodland, wetland, grassland or recreational use which did not require filling because of the necessity of flood plain zoning to reduce damage to life and property.

The Wisconsin Supreme Court, using a different rationale, reached a similar result in Just v. Marinette County, 56 Wis.2d 7 (201 NW2d 761) (1972). The court upheld restrictions on land use within 1,000 feet of lakes or within 300 feet of navigable streams on the ground that the landowner had no right to use his land to the detriment of the public. This approach was also followed in Sibson v. State, 115 N. H. 124 (336 A2d 239) (1975), upholding a tidal wetlands Act. Similarly, Maryland's Supreme Court, through analogy to public nuisance law, upheld a coastal land use Act and the denial of a dredging permit, reasoning that regulation or restraint of a use of land that would be injurious to the rights of the public is a valid exercise of the police power. Potomac Sand & Gravel Co. v. Gov. of Maryland, 266 Md. 358 (293 A2d 241), cert. den., 409 U. S. 1040 (93 SC 525, 34 LE2d 490) (1972).

Appellant has cited several cases in which land use development plans were held unconstitutional. One of these, Morris County Land Improvement Co. v. Parsippany-Troy Hills, 40 N. J. 539 (193 A2d 232) (1963),

is easily distinguishable. In that case, zoning of petitioner's land for agricultural purposes was held unconstitutional as a ploy to keep the land in its natural state and its price depressed until the state or national government could condemn it for a flood control project. Further, the court noted that a zoning ordinance was involved, not land use restrictions enacted pursuant to the exercise of other police powers. 40 N. J. 546, n.1. Our case also does not involve zoning but land use restrictions necessary for the public health and safety which presumably would be valid in New Jersey as well. See Fred v. Mayor &c. of Old Tappan, 10 N. J. 515 (92 A2d 473) (1952).

Although Dooley v. Town Plan & Zoning Comm., 151 Conn. 304 (197 A2d 770) (1964), invalidated land use zoning as applied to Dooley's land, the case is read narrowly by its court which upheld the denial of a permit to fill tidal wetlands in Brecciaroli v. Conn. Comr. of Env. Protection, 168 Conn. 349 (362 A2d 948) (1975).

Appellant also relies heavily upon Justice Holmes' opinion in Pennsylvania Coal Co. v. Mahon, 260 U. S. 393 (43 SC 158, 67 LE 322) (1922). The essence of that opinion is that the state ran afoul of the Constitution by denying to the mining company the entire value of its rights in the land. The mining company sold the surface rights in the property but retained the right to mine coal without liability for damage caused by the mining. The Pennsylvania legislature then forbade mining that would endanger surface support for streets or homes. Since coal mining causes subsidence, the coal company would be unable both to mine and to comply with the legislation. The Supreme Court held that a "taking" had occurred because the legislature had, in essence, stripped the company of all its rights — the contract right to mine and the property right to subsurface minerals. Pope cannot fit herself within the rationale of Mahon because the River Act and Corridor Study only regulate her use of her property and do not deprive her of all her rights in the property.

A similar objection can be made to appellant's reliance on Pumpelly v. Green Bay &c. Co., 80 U. S. 166 (20 LE 557) (1871). The government permanently flooded

Pumpelly's land when it dammed a river for flood control. The Supreme Court found that all reasonable use of Pumpelly's land was taken by the flooding. Pope may use her land within the exceptions of Section 12 of the River Act or when she demonstrates that her use will not "result in significant land erosion, stream bank erosion, siltation or water pollution." River Act, § 8.

We therefore find that the River Act and Corridor Study do not violate the Constitution of Georgia.

*Judgment affirmed. All the Justices concur, except Jordan, Bowles, and Marshall, JJ., who dissent.*

SUBMITTED JULY 7, 1978 — DECIDED SEPTEMBER 27, 1978 — REHEARING DENIED OCTOBER 16, 1978.

*Moreton Rolleston, Jr.*, for appellant.

*Mary Carole Cooney, Ferrin Y. Mathews, Arthur K. Bolton, Attorney General, Isaac Byrd, Assistant Attorney General, Harvey Koenig*, for appellees.