

**SUPREME COURT OF GEORGIA**

Atlanta          November 2, 2017

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

It appearing that the enclosed opinion decides a second-term appeal, which must be concluded by the end of the August Term on November 18, 2017, it is ordered that a motion for reconsideration, if any, including any motions submitted via the Court's electronic filing system, must be **received** **in the Clerk's Office by 10:00 a.m. on Thursday, November 9, 2017.**

SUPREME COURT OF THE STATE OF GEORGIA

Clerk 's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

, Clerk

In the Supreme Court of Georgia

Decided: November 2, 2017

S17A1140, S17X1235.  DIVERSIFIED HOLDINGS, LLP v. CITY OF SUWANEE; and vice versa.

GRANT, Justice.

This case presents a zoning dispute between the Appellant Diversified Holdings, LLP ("Diversified") and the City of Suwanee ("the City") regarding the status of 30 acres of undeveloped land located in the City ("Property").  We hold that because Diversified seeks review from an adjudicative decision made by a local government body acting in an administrative role, an application for discretionary appeal was required.  Because Diversified did file an application for discretionary review, which we granted, we have jurisdiction over its appeal.  On the merits of the issues presented, we affirm the trial court's decision that there was no error in denying Diversified's application to rezone the Property.  But we clarify that the "substantially advances" standard that derives from constitutional due process guarantees has no place in an eminent domain or inverse condemnation proceeding.  Consequently, where a landowner claims harm from a particular zoning classification, inverse

condemnation is not an available remedy unless the landowner can meet the separate and distinct requirements for such a claim. Because we affirm the trial court's decision that the denial of Diversified's application was not arbitrary or capricious, we do not reach the City's contention on cross appeal that the trial court erred in concluding that Diversified showed a substantial detriment based on the value of the Property as currently zoned versus its value if rezoned.

## I.

The Property is zoned for commercial use in accordance with the City's 2030 Comprehensive Plan. The City's comprehensive plan envisions that the Property will be used for high density, high intensity office space. Although the Property is in a largely commercial area, Diversified insists that for the past 26 years it has been unable to sell the Property as zoned, but has received multiple purchase offers contingent upon the Property being rezoned for multi-family use.[1] Consequently, Diversified sought to have the Property rezoned in

---

[1] Diversified acquired 26 acres of the Property in the late 80s or early 90s. Those 26 acres are zoned C2. According to the parties, C2 zoning does not allow for alcohol consumption or for the commercial sale of beer and wine. Diversified acquired approximately 4 acres of the Property in 2012. Those four acres are zoned C2A, which allows for the sale or consumption of alcohol.

that manner, claiming, among other things, that the existing zoning regulation was unconstitutional as applied to the Property. The City Council, on recommendation from the City's Planning Commission, denied Diversified's application to rezone the Property from commercial, C2 or C2A, to RM-8, which would have permitted multi-family use.[2]

Diversified then filed suit in Gwinnett County Superior Court, alleging that the City's decision constituted an unconstitutional taking of the Property.[3] Diversified requested that the trial court enjoin the City from interfering with Diversified's use of the Property in the manner represented in its rezoning application. Diversified also requested that the court find and declare the City's acts in denying its rezoning application were "unlawful, irrational, a manifest abuse of discretion, a taking of property, unconstitutional, null, and void." Although Diversified sought an award of attorney's fees and litigation

---

[2] The areas surrounding the Property are largely commercial and include a Super 8 Motel, Red Roof Inn, Wal-Mart, office warehouse, and liquor store. Across the street there is property zoned for mixed-use development to include residential, commercial, and office development. Diversified seeks rezoning in order to sell the Property for development as an apartment complex.

[3] Diversified specifically argued that the City's "C-2 and C-2A zoning classification *as applied to this specific property* is unconstitutional *and that RM -8 is the only zoning classification that would be constitutional* given the particular characteristics of this unique property." (Emphasis added).

expenses, the complaint did not seek other damages.

After a bench trial, the trial court made the following findings. Since 2012, Diversified has used a broker who undertook a marketing campaign to sell the Property. Although it has not had success marketing the Property as a commercial property, Diversified has received numerous inquiries from potential purchasers who are interested in developing the Property for multi-family use. Every contract that Diversified has entered into contained contingencies that required the City to rezone or grant a special use permit. Ultimately, none of those contracts closed. The parties agree that due to steep topography and streams, not all of the Property can be feasibly developed, and rezoning would permit Diversified to develop the most acreage possible. Indeed, the trial court concluded that the fair market value of the Property would increase tremendously if it were rezoned: As currently zoned, the Property has a fair market value between $600,000 and $1.5 million; if rezoned for multifamily use, the Property would have a fair market value of approximately $5.9 million.

The trial court found that Diversified carried its burden to show by clear and convincing evidence that the City's current zoning of the Property has

4

caused Diversified a significant detriment. The trial court also found, however, that the current zoning is substantially related to the public health, safety, morality, and welfare, because the existing commercial zoning is compatible with surrounding commercial uses and is consistent with the City's comprehensive plan and economic development. The trial court concluded that the consistency of the existing zoning with the City's long-term planning goals demonstrates a substantial benefit to the public welfare. For example, in the trial court's view, the lack of sidewalks on the Property would pose an unreasonable and unsafe risk for persons who would reside in the proposed apartment development and there is a reasonable and valid concern that apartment dwellers would face a potential for increased nighttime crimes because the complex would be adjacent to a liquor store, two motels, and a Wal-Mart.

In sum, the trial court found that Diversified had not carried its burden to show that the current zoning was not substantially related to public health, safety, and welfare. Accordingly, the trial court's order concluded that the City's determination that the current zoning regulation was not improper as applied to Diversified's property was not arbitrary, capricious, or without

rational basis. The trial court specifically stated that the City's decision did not constitute an abuse of discretion and did not work an unconstitutional taking.

Out of an abundance of caution, Diversified then filed both a direct appeal and an application for discretionary appeal from the trial court's order. The City filed a cross appeal. This Court granted Diversified's application for discretionary appeal and posed a single question: Is a party seeking to appeal a superior court's ruling on an inverse condemnation claim required to file a discretionary application if that claim is based on a local board's zoning decision? In addition to answering that question by asserting that direct appeal is lawful, Diversified contends that (1) the trial court erred in determining that the Property's current zoning is substantially related to public health, safety, and welfare, and (2) the trial court erred in concluding that the City had demonstrated a justification for the current zoning that is reasonably related to the public interest. In its cross appeal, the City contends that the trial court erred in determining that Diversified showed a significant detriment based on the Property's value as currently zoned when compared to its value if rezoned.

6

II.

We turn first to the question of jurisdiction and appellate procedure that was presented to the parties, that is, whether a party seeking to appeal a superior court's ruling on an inverse condemnation claim is required to file a discretionary application when that claim is based on a local board's zoning decision.[4] The trial court's order affirming the City's denial of Diversified application for rezoning is a final order; we are not hindered by any interlocutory appeal questions. OCGA § 5-6-34 (a) (1). Generally, final orders are subject to direct appeal. Nevertheless, here and for any "final order," OCGA § 5-6-34 (a) (1) directs that we consider whether that order is subject

---

[4] It bears noting here that the type of claim initially raised by Diversified is often characterized, both before the local authorities and in the courts, as an "application for rezoning." But that description, while perhaps a helpful shorthand, does not accurately convey the complete nature of the decision that the zoning authority is being asked to make in the first instance—or the complete set of remedial measures that may be available to a zoning authority in a given case. At its heart, the application that gave rise to this case sought a conclusion that the current zoning ordinance was unconstitutional or otherwise unlawful with respect to the Diversified property. In order to avoid confusion, we continue to use the "application for rezoning" shorthand, but do so with the understanding that it connotes a broader inquiry into whether the current zoning is appropriately applied to the property at issue. We do not address whether an application sounding purely in policy rationales may lead to a different analysis.

7

to the discretionary application procedure outlined in OCGA § 5-6-35 (a) (1).

That provision requires an application for a certain class of cases:

Appeals from decisions of the superior courts reviewing decisions of the State Board of Workers' Compensation, the State Board of Education, auditors, state and local administrative agencies, and lower courts by certiorari or de novo proceedings; provided, however, that this provision shall not apply to decisions of the Public Service Commission and probate courts and to cases involving ad valorem taxes and condemnations.

We recently reiterated that boards of commissioners are acting as administrative agencies under OCGA § 5-6-35 (a) (1) when they are "performing a function that is 'the equivalent of the function of an administrative agency.'" *Schumacher v. City of Roswell*, 301 Ga. 635, 635 (803 SE2d 66) (2017) (quoting *Swafford v. Dade County Bd. of Commrs.*, 266 Ga. 646, 647 (469 SE2d 666) (1996)); *Bentley v. Chastain*, 242 Ga. 348, 349 (249 SE2d 38) (1978) (characterizing a Board of Zoning Appeals as an administrative agency with both quasi-legislative and quasi-judicial duties, which include determining "whether the factual situation of a given individual's property warrants relief from the general zoning ordinance under the standards set out by the delegating authority."). And we have explained that the discretionary application procedure applies to *adjudicative* or quasi-

judicial decisions by local administrative agencies.  See *State v. Int'l Keystone Knights of the Ku Klux Klan, Inc.*, 299 Ga. 392, 402 (788 SE2d 455) (2016) ("Both the text and immediate context of OCGA § 5-6-35 (a) (1) indicate that a 'decision,' as it is used with reference to administrative agencies, is a determination of an adjudicative nature.").

As the opinion in *International Knights* recognized, "'the line between legislative and adjudicative is not always easy to draw.'"  Id. at 401 (quoting *LC&S, Inc. v. Warren Cnty. Area Plan Comm.*, 244 F3d 601, 603 (7th Cir. 2001)).  And generally speaking, while

> [a]dministrative determinations of a legislative nature are prospective in application, general in application, and often marked by a general factual inquiry that is not specific to the unique character, activities or circumstances of any particular person, . . . [d]eterminations of an adjudicative nature, on the other hand, are immediate in application, specific in application, and commonly involve an assessment of facts about the parties and their activities, businesses, and properties.

*Int'l Knights*, 299 Ga. at 401 (internal punctuation and citations omitted).

An adjudicative decision can be quasi-judicial in nature and is characterized by proceedings that inquire into the facts and circumstances of the party (or parties) appearing before the decision maker.[5]  Id. (citing *RR Vill.*

---

[5] The parameters of executive decisions are beyond the scope of this opinion.

*Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir. 1987) ("The test for determining whether official action is adjudicative or legislative focuses on the function performed by the decisionmaker.")). Generally, an adjudicative decision operates to address a specific dispute or determine rights and obligations of a particular party or parties. The resulting decision seeks to establish those rights and obligations or otherwise resolve the dispute, and is immediate in application. A legislative decision, on the other hand, is usually marked by a general inquiry, often not limited to the facts and circumstances of specific people or properties, which results in a rule of law or course of policy that will apply in the future. Id. at 402 (citing *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (29 SCt 67, 53 LEd 150) (1908) ("Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power.")).

Years before we focused on the distinction between adjudicative, legislative, and executive decisions in the context of OCGA § 5-6-35 (a), this

Suffice it to say that, as we recognized in *International Knights*, administrative agencies may make adjudicative, legislative, or executive decisions. *Int'l Knights*, 299 Ga. at 400-401.

Court announced that "all zoning cases appealed either to the Court of Appeals or the Supreme Court of Georgia must . . . come by application." *Trend Dev. Corp. v. Douglas Cty.*, 259 Ga. 425, 426 (383 SE2d 123) (1989). And in *Rubin*, we reiterated that all appeals in zoning cases require an application. *O.S. Advertising Co. of Georgia, Inc. v. Rubin*, 267 Ga. 723, 725 (482 SE2d 295) (1997). Like this case, *Trend* was an appeal of a superior court decision rejecting a landowner's argument that a zoning regulation should not apply to a particular piece of property. *Trend*, 259 Ga. at 426. And in the decades since that case was decided, *Trend*'s mandate that "all zoning cases" must be appealed through the discretionary process has been consistently followed by this Court and the Court of Appeals in numerous cases challenging the application of a zoning ordinance to a particular piece of property. See, e.g., *Hamryka v. City of Dawsonville*, 291 Ga. 124 (728 SE2d 197) (2012) ("Appellants [challenging the rezoning of a neighbor's property] then were able to obtain review in the superior court of the issues they raised or could have raised *before the administrative agency*. Appellants therefore already had the opportunity to be heard by two tribunals—a local administrative agency and a superior court—and now ask this appellate court to consider *the*

11

*administrative decision* yet again."); *Jervey v. City of Marietta*, 274 Ga. 754 (559 SE2d 457) (2002) (discretionary application granted to consider appeal from denial of application to rezone); *Powell v. City of Snellville*, 275 Ga. 207 (563 SE2d 860) (2002) (dismissing direct appeal and granting application for discretionary review of refusal to rezone property); *City of Atlanta v. Tap Assocs.*, 273 Ga. 681 (544 SE2d 433) (2001) (concluding, after granting discretionary application to appeal denial of rezoning, that "legislative judgment" of zoning ordinance must be allowed to control where petitioner had not met its burden); *Cobb Cty. v. McColister*, 261 Ga. 876 (413 SE2d 441) (1992) (denial of application to rezone property requires application for discretionary review under *Trend*); *Waffle House v. DeKalb Cty.*, 261 Ga. 324 (406 SE2d 477) (1991); *Delta Cascade Partners, II v. Fulton Cty.*, 260 Ga. 99 (390 SE2d 45) (1990) (appeal from superior court's judgment upholding denial of zoning request requires discretionary application).

Recently, in *Schumacher*, we determined that certain challenges to the exercise of legislative power do not fit within *Trend*'s definition of "zoning cases," although we noted that *Trend* itself involved the sort of individualized determination that we would generally consider a "decision" under the

discretionary application statute. *Schumacher*, 301 Ga. at 635 (citing *Int'l Knights*, supra). In doing so, we further clarified the contours of our zoning jurisprudence by establishing that a "zoning case," refers to "a case involving a 'decision' by an 'administrative agenc[y]' dealing with the zoning or allowed use of a particular parcel of land." Id.

*Schumacher* found that "a stand-alone lawsuit challenging an ordinance as facially invalid—unconnected to any individualized determination about a particular parcel—is not a 'zoning case'." Id. But an appeal from a superior court order reviewing a local government decision denying an application to rezone a specific property differs from an appeal from a lawsuit that challenges the enactment of a code of development or zoning code. See id. (contrasting lawsuits challenging the legislative decision underlying the enactment of a development code with suits seeking individualized zoning-related relief). These distinctions are relevant. The enactment of a development or zoning code is, quintessentially, a legislative action that is prospective in application. Id. In contrast, an application to rezone a particular parcel like the application involved here involves an individualized determination based on the character and circumstances of that particular parcel of land. A landowner's challenge

13

that seeks recognition that a zoning ordinance is unlawful with respect to a particular parcel of land thus is the type of individualized application of law to facts and circumstances that constitutes an adjudicative decision and requires a discretionary application. See *Jervey v. City of Marietta*, 274 Ga. 754 (559 SE2d 457) (2002) (granting discretionary appeal to review superior court decision reviewing the denial of a rezoning application).

Here, the superior court's order contains a lengthy description of the Property, details Diversified's efforts to sell the Property, discusses the topography and surrounding areas, and analyzes factors relating to the use and value of the Property. Diversified's complaint alleges that the current zoning is unlawful for *this* property, not that the adopted zoning scheme is unlawful for *any* property. And the City's decision to reject that claim was immediate in application, specific in effect, and involved an individualized assessment of the Property. *City of Cumming v. Flowers*, 300 Ga. 820, 824 (797 SE2d 846) (2017) (citing *Int'l Knights*, 299 Ga. at 401 (2016)). That argument differs significantly from the one presented in *Schumacher*, in which the appellant challenged the adoption of the development code itself but did not challenge

14

any "individualized decision to change the zoning of any particular property." Id. at 635.

What's more, Diversified has had the opportunity to be heard by two tribunals in this case.[6] Diversified filed an application to amend the official zoning map of the City requesting that the Property be rezoned from commercial to a use permitting multi-family development, claiming that the zoning would otherwise be unconstitutional as applied to that property. The Suwanee City Council filed a response to that rezoning application. Diversified provided documents supporting its application to amend the zoning ordinance and purporting to raise both a due process claim and an inverse

---

[6] We have not held that adjudication by two tribunals is a requirement for the discretionary application procedure. Instead, review by a local tribunal and a superior court is one factor that this Court has considered in determining whether rezoning cases, such as this one, involve the type of administrative decision that requires a discretionary application to appeal. See, e.g., *Ladzinske v. Allen*, 280 Ga. 264, 265-266 (626 SE2d 83) (2006) (neighboring landowner seeking to challenge a zoning decision was required to file a discretionary appeal despite the fact that the superior court dismissed the complaint without reaching the merits); see also *Trend*, 259 Ga. at 426 (discretionary application necessary from superior court order affirming county board of commissioners' decision to deny rezoning request); *Ross v. Mullis Tree Serv., Inc.*, 183 Ga. App. 627, 627 (360 SE2d 288) (1987) (the discretionary application procedure is "applicable to appeals from decisions of the superior courts reviewing decisions of local zoning tribunals.").

15

condemnation claim.[7]  The City of Suwanee Planning Department reviewed the application and recommended that Diversified's request to rezone the Property be denied based, in part, on conflicts with the City's comprehensive plan.  Subsequently, the City Council unanimously denied the application. Diversified then filed suit in superior court alleging that the City's decision was unconstitutional.  Diversified's complaint asked the superior court to review a decision of a local administrative agency.  This falls squarely within the discretionary appeal procedures that give appellate courts the discretion not to entertain an appeal where the superior court had reviewed the acts of certain lower tribunals.  *Hamryka v. City of Dawsonville*, 291 Ga. 124, 126-127 (728 SE2d 197) (2012).

The analysis in Section IV below only confirms that the local authority's decision is adjudicative in nature.  The inquiry in this type of request is a fact-specific one, evaluating the balance between factors to conclude whether a zoning ordinance substantially burdens a property owner in the first place, and, if it does, whether that same ordinance is also substantially related to the public health, safety, morality, or general welfare.  See *infra* at 28.  And this Court

_____

[7] We discuss the merits of these claims more fully in section IV, infra.

16

plainly has no authority to "legislate" for a local zoning authority should we determine that the authority's decision was incorrect. But what we can do, and what petitioners ask for us to do, is adjudicate whether a particular zoning ordinance is unconstitutional as applied to a particular piece of land. That leaves the ultimate remedial measures open to the judgment of the zoning authority, which may or may not choose to take (or recommend) legislative action. Nonetheless, its decision in the first instance, just like ours, was adjudicative in nature.

Accordingly, and without addressing whether an appeal from a true inverse condemnation proceeding would require a discretionary application, we conclude that the present appeal, which is from a superior court order affirming a local zoning board's decision that the zoning regulations applied to a particular piece of property are not unlawful, is the type of individualized determination that remains subject to the application procedure set out in OCGA § 5-6-35 (a) (1).

III.

17

We now turn to the proper application of the law to the claims in this case, which have been characterized by the parties as sounding in inverse condemnation. Inverse condemnation claims draw their meaning and remedies from the eminent domain provisions in the Fifth Amendment of the United States Constitution and Article 1, Section 3, Paragraph I of the Georgia Constitution, each of which protects against uncompensated "takings." But, as the United States Supreme Court has appropriately noted, "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123 (98 SCt 2646, 57 LE2d 631) (1978). We need not answer that question in full today, nor could we, given the "ad hoc" nature of the tests that courts have applied. Id. But what we can do is provide some needed clarity about the nature of inverse condemnation claims in Georgia.

At the outset, our cases and those of the federal courts have articulated a distinction between eminent domain and the police power; the two powers serve a different set of purposes and are subject to different limitations. As we have explained, "There is a basic distinction between police power and that of eminent domain. The police power of the governing authority is properly used

18

to regulate property to prevent its use in a manner detrimental to the public interest, while the exercise of eminent domain involves the taking of property because it is needed for public use." *Mayor & Aldermen of the City of Savannah v. Savannah Cigarette & Amusement Servs.*, 267 Ga. 173, 174 (476 SE2d 581) (1996); see also *Pope v. City of Atlanta*, 242 Ga. 331, 334 (249 SE2d 16) (1978) ("The difference between use of eminent domain and use of the police power is that the former involves the taking of property because it is needed for public use while the latter involves the regulation of the property to prevent its use in a manner detrimental to the public interest.").

Moreover, "[i]t is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people all alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 318-319 (107 SCt 2378, 96 LE2d 250 (1987) (citing *Armstrong v. United States*, 364 U.S. 40, 49 (80 SCt 1563, 4 LE2d 1554) (1960)); *Woodside v. City of Atlanta*, 214 Ga. 75 (103 SE2d 108) (1958) (while Georgia's Constitution provides that the right of eminent domain shall "never be abridged," that power cannot be exercised

absent just compensation). Accordingly, the eminent domain language in the federal constitution and our state constitution is clear that those provisions do not provide an independent bar to the government exercising eminent domain over lands needed for public uses: "As its text makes plain, the Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'" *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 536 (125 SCt 2074, 161 LE2d 876) (2005) (quoting *First English Evangelical*, 482 U.S. at 314). That condition, generally, is the payment of fair market value or "just compensation." *Wright v. Metro Atlanta Transp. Auth.*, 248 Ga. 372, 373 (283 SE2d 466) (1981).

The classic application of eminent domain is the actual and complete taking of property by the government in order to use that property for a public purpose. See *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (121 SCt 2448, 150 LE2d 592) (2001). But as the regulatory state increased in size and scope, so did the range of actions that could constitute a "taking." After all, if compensation were required for a standard condemnation but not for a regulatory infringement, "the natural tendency of human nature would be to extend regulations 'until at last private property disappears." *Murr v.*

*Wisconsin*, 137 SCt 1933, 1951 (198 LE2d 497) (2017) (Roberts, C.J, dissenting) (punctuation and citation omitted). The United States Supreme Court first applied the Takings Clause to regulatory action in *Pennsylvania Coal Co. v. McMahon*, 260 U.S. 393 (43 SCt 158, 67 LE2d 322) (1922). There, petitioner had sold surface rights to land but retained mining rights; because the relevant statute made it commercially impracticable to mine the coal on petitioner's land, it "had nearly the same effect as the complete destruction of the rights claimant had reserved," so the government had effectively taken the land without providing just compensation. Id. at 414-415. That type of regulatory taking has become known as "inverse condemnation," and although federal and state courts have struggled with how to determine what constitutes a taking in the regulatory context, the claim is a common and constitutionally appropriate one.

Federal cases have coalesced around the idea that two categories of regulatory action will be deemed per se takings under the Fifth Amendment. First is the permanent physical infringement of property. See *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (102 SCt 3164, 73 LE2d 868) (1982). The second is where a regulation deprives the property owner of

"*all* economically beneficial uses." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (112 SCt 2886, 120 LE2d 798) (1992). Cases that fall outside these two categories have been analyzed according to the factors set out in *Penn Central*, including the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Cent.*, 438 U.S. at 124. *Penn Central* also describes the importance of the "character of the government action" in the analysis, noting that an act is more likely to be considered a taking when it constitutes a physical invasion rather than "when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Id.

We have followed suit. A plaintiff seeking to challenge a government regulation as an uncompensated exercise of the government's eminent domain power must show that the regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster." *Mann v. Georgia Dep't of Corr.*, 282 Ga. 754, 757 (653 SE2d 740) (2007) (citing *Lingle*, 544 U.S. at 539). And this Court has explained the contours of the most straightforward inverse

condemnation claim—the permanent, physical occupation of (or impact on) property:

> [P]rivate property owners may be compensated in inverse condemnation actions for the temporary taking of land for the paving of a turn lane, increased noise and odor from a county's sewage plant, and flooding, siltation, and pollution from surface water diverted by roadway maintenance.

*Rabun Cty. v. Mountain Creek Estates, LLC*, 280 Ga. 855, 856 (632 SE2d 140) (2006) (citations omitted); see also *Dep't of Transp. v. Edwards*, 267 Ga. 733, 736 (482 SE2d 260) (1997) (temporary taking of land for the paving of a turn lane); *Duffield v. DeKalb Cnty*, 242 Ga. 432, 433-434 (249 SE2d 235) (1978) (increased noise and odor from a county's sewage plant); *Powell v. Ledbetter Bros.*, 251 Ga. 649, 650 (307 SE2d 663) (1983) (flooding, siltation, and pollution from surface water diverted by roadway maintenance). In all of these cases, a county took some affirmative action for public purposes causing a nuisance or trespass that, in turn, resulted in the diminished utility and functionality of a private owner's land. That diminished functionality and utility, in turn, interfered with the owner's use and enjoyment of the land. We have also suggested that, for an alleged regulatory taking, inverse condemnation will apply when the owner was completely deprived of the use

of the property. See, e.g., *Threatt v. Fulton Cty*., 266 Ga. 466, 470 (467 SE2d 546) (1996); *Cobb Cty. v. McColister*, 261 Ga. 876, 876 (413 SE2d 441) (1992). We have also invoked *Penn Central* to analyze asserted regulatory takings that did not fall within these two categories. See, e.g., *Mann,* 282 Ga. at 757.

Inverse condemnation cases that do not fall within the per se categories outlined above have been notoriously hard to adjudicate, and even the *Penn Central* factors have led to "vexing subsidiary questions." *Lingle*, 544 U.S. at 539. In turn, the initial uncertainty about how to handle cases on the margins of inverse condemnation allowed a due process analysis to invade the takings jurisprudence. Id. at 540. Our precedents thus have not always been clear that eminent domain and due process are distinct constitutional inquiries, and have instead converted inverse condemnation into a species of due process claim. See, e.g., *Dep't of Transp. v. City of Atlanta*, 260 Ga. 699, 704 (398 SE2d 567) (1990) ("Substantive due process protects property owners from the arbitrary and capricious exercise of the power of eminent domain."). In addressing claims of inverse condemnation, our prior cases from time to time have veered into an articulation of two different theories of "takings."

The first, and most natural, formulation is the taking of property by eminent domain for public use, whether through regulation or condemnation. "The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo*, 533 U.S. at 617 (recognizing both physical and regulatory invasions). The second, more troublesome theory is that a regulation of property that violates constitutional due process guarantees constitutes a taking. The remedial aim of this latter type of claim is not just compensation; instead, litigants seek relief from the challenged regulation. Under this rubric, a plaintiff seeks to prove that a regulation has caused him to suffer "a significant deprivation insubstantially related to the public health, safety, morality[,] or welfare." *Gradous v. Bd. of Comm'rs of Richmond Cnty*, 256 Ga. 469, 470 (349 SE2d 707) (1986); *Guhl v. Holcomb Bridge Rd. Corp.*, 238 Ga. 322, 323 (232 SE2d 830) (1977). Once the plaintiff has met that burden, the government may try to justify the regulation as "reasonably related to the public interest." *Gradous* at 471.

The problem is that this balancing approach is not consistent with the differentiation we have recognized between the police power and the power of eminent domain. Nor does it follow from the text of the Takings Clause, which

mandates a remedy where the government takes private property for public use, but does not inquire into the wisdom of the policy at issue.[8]  Federal law now reflects that a distinction exists between cases alleging a due process violation and cases seeking just compensation, and that the "substantially advances" formula applied so often in inverse condemnation cases "prescribes an inquiry in the nature of a due process, not a takings, test, and . . . has no proper place in our takings jurisprudence."  *Lingle*, 544 U. S. at 540.   As the *Lingle* Court explained, "the 'substantially advances' inquiry reveals nothing about the *magnitude or character of the burden* a particular regulation imposes on private property rights.  Nor does it provide any information about how any regulatory burden is *distributed* among property owners."  Id. at 542 (emphasis in original).  In other words, rather than advancing an understanding of whether

---

[8] Of course, an exercise of eminent domain is only proper where the government acts to put the property to a public use.  See, e.g., *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 232-233 (123 SCt 1406, 155 L2d 376) (2003) ("While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes two conditions on the exercise of such authority: the taking must be for a 'public use' and 'just compensation' must be paid to the owner."); *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240 (104 SCt 2321, 81 L2d 186) (1984). But the question of whether a taking is for a public purpose is different than whether that public purpose is a wise one.

the effect of a regulation is "functionally comparable to a government appropriation or invasion of private property," this test evaluates a regulatory policy to determine whether its ends are sufficient to justify the means. Id. And that type of substantive inquiry "is tethered neither to the text of the Takings Clause nor to the basic justification for allowing regulatory actions to be challenged under the Clause." Id.

Although we've not been so direct about our own conclusion, this Court has already recognized the United States Supreme Court's decision in *Lingle*, and the potential inaptitude of the "substantially advances" test for regulatory takings. See *Mann*, 282 Ga. at 760 & n.7 (2007) (citing *Lingle* and presuming "arguendo, that the substantiality of the public purpose advanced by a regulation is still pertinent to a takings challenge"). Under a true takings challenge, we recognized, "the focus of the takings analysis is on whether the government takes property, not on whether the government has a good or bad reason for its action." Id. (citing Barros, *At Last, Some Clarity: The Potential Long-Term Impact of Lingle v. Chevron and the Separation of Takings and Substantive Due Process,* 69 Alb. L. Rev. 343, 354 (2005)).

We have also acknowledged that zoning is unlikely to be a fertile ground for inverse condemnation claims. See, e.g., *Alexander v. DeKalb Cnty.*, 264 Ga. 362, 363 (444 SE2d 743) (1994) overruled on other grounds by *In re Crane*, 253 Ga. 667 (324 SE2d 443) (1985); *Mayor & Alderman of the City of Savannah*, 267 Ga. at 174 (assuming, only arguendo, that inverse condemnation is an available remedy in rezoning cases); see also *City of Tybee Island v. Live Oak Group, LLC*, 324 Ga. App. 476, 479 (751 SE2d 123) (2013) ("While the theory of inverse condemnation arises out of the eminent domain paragraph of the Georgia Constitution, . . . it is not synonymous with a claim attacking the constitutionality of an existing zoning ordinance following the denial of an application to rezone."). Indeed the majority in the seminal *Penn Central* case rejected zoning regulations as a likely source of inverse condemnation. See *Penn Central*, 438 U.S. at 125 (citing zoning as "the classic example" of the Court upholding "land-use regulations that destroyed or adversely affected recognized real property interests").[9] Zoning, in short, does not ordinarily present the kind of affirmative public use at the expense of the

---

[9] It bears noting that, although we do not endorse this alternative view, the dissenting opinion in *Penn Central* would have entirely barred zoning from serving as the source of a takings claim. Id. at 146 (Rehnquist, J., dissenting) ("[Z]oning does not constitute a 'taking.'").

28

property owner that effects a taking, and we have previously recognized as much.  See, e.g., *McColister*, 261 Ga. at 876 (finding no compensable taking occurred during the period between the filing of an application to rezone property and the final decision approving the rezoning when the landowner had not been deprived of all use of his property).

None of this means that the "substantially advances" test outlined in *Gradous*, *Guhl*, and other cases—including this one—is an invalid way to analyze whether a zoning regulation is constitutionally arbitrary and capricious as applied to a particular parcel of land.  It only means that this type of claim is rooted in due process guarantees against arbitrary exertion of the police power rather than in the government's authority to take private property through eminent domain.  "There is no question that the 'substantially advances' formula was derived from due process, not takings, precedents." *Lingle*, 544 U.S. at 540-541 (noting that in support of the "substantially advances" test outlined in *Agins v. City of Tiburon*, 447 U.S. 255 (100 SCt 2138, 65 LE2d 106) (1980), the Court had cited to a due process case, *Nectow v. Cambridge*, 277 U.S. 183 (48 SCt 447, 72 LE2d 342) (1928)); see also

*Barrett v. Hamby*, 235 Ga. 262 (219 SE2d 399) (1975) (citing *Nectow* to support "substantial relation" balancing test for zoning claims).

When the property owner's right to the unfettered use of his property confronts the police power under which zoning is effected, due process guarantees act as a check against the arbitrary and capricious use of that police power. See, e.g., *Dep't of Transp. v. City of Atlanta*, 260 Ga. 699 (398 SE2d 567) (1990). The balance our law strikes is that a zoning classification that substantially burdens a property owner may be justified if it bears a substantial relation to the public health, safety, morality, or general welfare. *Guhl*, 238 Ga. at 323; see also *Holy Cross Lutheran Church, Inc. v. Clayton Cty.*, 257 Ga. 21, 23 (354 SE2d 151) (1987). Lacking that kind of justification, the zoning may be set aside as arbitrary or capricious. Id. If a land-use regulation is arbitrary and capricious then the regulation cannot stand. The remedies available in such cases include declaring the regulation unlawful as applied to the property at issue, although we've been clear that courts should give local governing bodies a reasonable opportunity to reconsider rezoning applications or otherwise take action to conform their regulations to the law. See *Town of Tyrone v. Tyrone, LLC*, 275 Ga. 383, 384 (565 SE2d 806) (2002) (citing *Cobb*

*Cty. v. Wilson*, 259 Ga. 685, 685 (386 SE2d 128) (1989)).  But we have identified no zoning case where the party claiming inverse condemnation received a "takings" remedy, that is, financial damages to compensate for the loss of their property.

IV.

Diversified's complaint alleges both an inverse condemnation and a due process violation.  But because Diversified requested relief in the form of rezoning without seeking damages for a taking, their claim is properly understood as sounding in due process.  Regardless of its language intermixing due process and inverse condemnation claims (understandable given our own lack of precision in the past), the trial court applied the correct standard and concluded, in part, that the Property's current zoning is substantially related to the public's health, safety, morality, and welfare.  We agree.[10]

We start with the proposition that a zoning ordinance is presumptively valid.  *Guhl*, 238 Ga. at 323-24.  To overcome this presumption, the party

---

[10] We do not reach the issue of whether Diversified could have stated a claim for inverse condemnation under these facts, but as noted, a local government's zoning decision does not ordinarily give rise to a successful inverse condemnation claim.  See Division III, supra.  We answer only the question of whether the zoning decision at issue violated constitutional guarantees of due process.

challenging a zoning ordinance must show, by clear and convincing evidence, that the zoning at issue presents a significant detriment to the landowner and is insubstantially related to—in other words, does not "substantially advance"—the public health, safety, morality, and welfare. *Parking Ass'n of Ga.*, 265 Ga. at 765. Although the validity of a zoning ordinance's application to a particular property must be determined on a case-by-case basis, the following factors are considered:

> (1) existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values of the plaintiffs promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public, as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the property.

*Guhl*, 238 Ga. at 324. And we have previously acknowledged a number of interests that will support a restriction on land use, including aesthetics, environmental impact, injury to neighboring property, traffic impacts and potential hazards to pedestrians, and the long-range planning goals for the area. *City of Atlanta v. Awtry & Lowndes Co.*, 205 Ga. 296, 296 (53 SE2d 358) (1949) (injury to neighboring property); *Pope v. City of Atlanta*, 242 Ga. 331,

32

336 (249 SE2d 16) (1978) (environmental impact); *Westbrook v. Bd. of Adjustment*, 245 Ga. 15 (262 SE2d 785) (1980) (traffic impact and pedestrian hazards); *Parking Ass'n*, 264 Ga. at 765-66 (aesthetics); *City of Atlanta v. Tap Assocs.*, 273 Ga. 681, 683 (544 SE2d 433) (2001) (long-range planning goals). Balancing the *Guhl* factors, as the trial court did, leads to the conclusion that the City's denial of Diversified's petition to rezone the Property should be affirmed.

Like much of the area surrounding it, Diversified's property is currently zoned for commercial use. Although the Property abuts a roadway, it has no sidewalks. The trial court specifically noted that the lack of sidewalks poses an "unreasonable and unsafe risk" to pedestrians who would be accessing the Property if it were rezoned. The potential increase in pedestrian hazards if a rezoning request is granted is a valid consideration supporting the denial of rezoning. See *Westbrook*, 245 Ga. at 15 (denial of the landowner's request to rezone his property from residential to commercial was not unconstitutional when the surrounding area was largely residential and there was evidence that an increase in traffic volume would create a hazard for pedestrians).

The trial court also noted that the surrounding conditions, including the commercial nature of the businesses abutting the Property, support the current commercial zoning. And it also acknowledged that the City's comprehensive plan (which provides for the Property's commercial zoning) is a detailed and thorough plan for economic development within the City. Whether the current zoning is consistent with the policies and long-range planning goals for the area is a factor courts consider in determining whether the zoning substantially benefits the public health, safety, and welfare.[11] *Tap*, 273 Ga. at 683. This is particularly relevant when the zoning ordinance at issue was adopted after extensive study and public debate. Id. The trial court ultimately concluded that the current zoning was substantially related to the public health, safety, and welfare. We see no error in that conclusion.

Diversified contends that the trial court did not undertake an appropriate analysis of whether the Property is suitable for development in accordance with the City's comprehensive plan. In other words, Diversified maintains that the

---

[11] We find no merit to Diversified's claim that the trial court relied exclusively on the presence of the comprehensive plan as evidence of substantial public benefit. The trial court made numerous findings of fact and conclusions of law and cited to public benefits and detriments unrelated to the comprehensive plan.

Property cannot be developed for commercial use and cannot realistically be developed for high-density office space as the City envisions—meaning, one assumes, that the current zoning restriction is arbitrary and capricious. But, as the City points out, there was evidence that the Property could be developed for some commercial use, including low-intensity office space. And, as both parties concede, much of the difficulty in developing the Property stems from the Property's topography—which, of course, remains unchanged by its zoning classification. It is not for this Court to determine whether the City could have made a different or better zoning classification. Id. at 684. When the validity of the legislative classification for zoning purposes is debatable, that judgment must be allowed to control. *Id.* at 683. [12]

_____

[12] Because we conclude that the current zoning classification is substantially related to the public health, safety, and welfare, we need not reach the City's contention on cross appeal that the trial court erred in determining that Diversified showed a "substantial detriment" based on the refusal to rezone the Property. See *Holy Cross*, 257 Ga. at 21 (1) (party requesting rezoning must show by clear and convincing evidence *both* a significant detriment and that the existing zoning bears an insubstantial relationship to the public interest). We note that, in zoning challenges, the pertinent question is not whether rezoning would increase the value of property, but rather whether the existing zoning classification serves to deprive a landowner of property rights without due process of law. *DeKalb Cty. v. Dobson*, 267 Ga. 624, 626 (482 SE2d 239) (1997). That the property would be more valuable if rezoned borders on being irrelevant. Id. Instead, the only relevant evidence regarding the value of the subject property is its value as it currently is zoned. Id.

The cases Diversified relies on do not lead to a different conclusion. The surrounding area near the Property, perhaps with the exception of a proposed development across the street, do not have residential uses (pre-existing or otherwise). The Property abuts the road and surrounding commercial zones with no buffer. And there is no indication that the City has sanctioned any violations of the comprehensive plan in the areas surrounding the Property. Thus, even accepting that the Property has been vacant for many years, this case does not present facts that support invalidating the current zoning classification on due process grounds. Cf. *DeKalb Cty. v. Albritton Properties*, 246 Ga. 103, 109 (344 SE2d 654) (1986) (finding that a comprehensive development plan was a "less effective planning tool" when the county violated its own plan to permit commercial development in residential areas and when the property in question abutted a "radically different land use approach" in a neighboring county); see also *Bd. of Comm'rs of Hall Cty. v. Skelton*, 248 Ga. 855, 855 (286 SE2d 729) (1982) (finding that a highway business zoning classification was not substantially related to public health, safety, and welfare, when many of the areas surrounding the property were

used for mobile homes and residential purpose and the property itself did not front the highway).

## V.

In sum, we conclude that an appeal from a trial court's order reviewing a local authority's decision regarding an application to rezone property —an application that, more precisely, is seeking an administrative determination that zoning is unconstitutional or otherwise unlawful because of the particular factual circumstances surrounding a given party's desired use of its land—is subject to the discretionary application procedure set out in OCGA § 5-6-35 (a). We affirm the trial court's conclusion that the denial of Diversified's application to rezone the Property was not arbitrary or capricious. Having already determined that the application to rezone the Property was properly denied, we do not reach the merits of the cross appeal.

Judgment Affirmed. All the Justices concur.

S17A1140, S17X1235.  DIVERSIFIED HOLDINGS, LLP v. CITY OF SUWANEE; and vice versa.

PETERSON, Justice, concurring.

I concur fully in the opinion of this Court, which I understand to be a faithful application (and careful explanation) of unchallenged precedent. I write separately to observe that our precedent regarding takings and inverse condemnation claims arising under the Georgia Constitution has rarely grappled with the actual text of the Just Compensation Clause from which they arise. Instead, we have relied primarily on federal precedents applying the Takings Clause of the Fifth Amendment to the United States Constitution. It's not at all clear to me that the Just Compensation Clause and the Takings Clause have the same scope and meaning.

The text of our Just Compensation Clause appears broader than the federal Takings Clause. The Takings Clause reads "nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. But the Just Compensation Clause provides (subject to a variety of subsequent textual exceptions) that "private property shall not be taken *or damaged* for public purposes without just and adequate compensation *being first paid.*" Ga. Const. of 1983, Art. I, Sec. III, Par. I (a) (emphasis added). This textual

difference between the Clauses seems to me significant enough to raise questions about the validity of our caselaw often interpreting the Clauses as essentially the same. Answering those questions would require our careful consideration of text, context, and history. And this provision of the Georgia Constitution has a particularly complex history; although present in every Constitution since 1861, its form has changed in some fashion in each new Constitution. But no party has raised or briefed such issues here, and so I leave them for another day.